Having conferred with my co-counsel, Mr. Havlant, if it pleases the court, we'd like to save two minutes convinced of our own pithiness. I'm Mr. Greigel for Local 331. Thank you, Your Honor. Your Honor, we're here today to talk about standing. The underlying opinion in this case is entirely centrally about standing. The trial court starts from a wrong place and unsurprisingly gets to a wrong place. The first fundamental error that was made by the trial court is as follows. It's a simple legal principle. Abundant law from this court and from the United States Supreme Court, including the Worth v. Selden case that everyone cites, the Phillips case that this court has issued, and numerous other cases say that when you're talking about Article III, constitutional standing, the merits don't matter. You are looking at an allegation of fact, a generalized allegation of an injury sufficient to suggest that the party has standing. What was the injury for the union? Very good question, Your Honor. The injury is entirely financial. We paid for drugs that were, in our allegations supported by abundant detail in this complaint, which Judge Chesler recognized, inferior. And they were inferior in this case because they were not as touted. They were touted. They were not what? They were not as they had been touted to be. But Judge Chesler said you had to allege that they were either ineffective or unsafe and didn't find that you had allegations that rose to that level in order for you to show that they were worth less than they should have been. Two immediate responses to that, Your Honor. First, in our pleadings, we allege specifically that as a factual matter, which at the pleading stage, the trial court was required to accept as true. We said these drugs are inferior because they are ineffective compared to the standard of care, but they cost much more. That was true for both the Temadar drug and its comparator DTIC, and that was true as well for the Intron A franchise drugs and the primary comparator drug there, BCG. And that, Justice Greenberg, if I may simply address what I would expect. Thank you very much. Judge Greenberg, I would expect would be your question, is how does that injury take us away from the paradigm that you set forth in the Mayo opinion, MAIO, that, of course, everyone cites in this case? And it's quite simple. The injury in MAIO, which the court found insufficient to grant standing, was that the party in interest said, we paid for an HMO. We paid for a plan that is now informed by corporate policies that disincentivize doctors to deliver quality health care. And the court pointed out, well, that may be true, but you are claiming a present financial injury for a harm that has not yet resulted. We don't have that paradigm. We actually have comparators, and we have specific factual evidence in the complaint from the defendant's own records that say, this stuff either doesn't work any better than the standard of care, and in some cases, it's dangerous. Our complaint is so full of relevant detail that gets this case into the land of plausibility from merely possibility that we have the defendant's own documents saying things like the following. We are getting reports of neutropenia from the use of this drug, and what that is is a white blood cell disorder that is potentially life-threatening. That certainly suggests inferiority and that you paid for something different from what you got. But that's true. I'm sorry. No, go ahead. You go. The particular drug you're referencing there is what? That drug, Your Honor, was Intron A. And Local 331 reimbursed costs for Intron A? Local 331, Your Honor, satisfies the identifiable trifle that this court has required under constitutional principles for article 3 standing. I'm going to answer it. Your Honor, we purchased prescriptions for two of our members for a drug called Revitron. Revitron is an Intron A franchise drug. And it's important not to lose sight of what this court has held in Phillips, that what is important is context. And Judge Chesler's opinion gives no credence to the context of this case, which is a corporate defendant that pled guilty to lying to the United States government about the extent of its impermissible marketing. Paid fines of $435 million in criminal penalties and civil pines and subjected itself to a corporate integrity agreement for a wrongdoing that the government was able to recover money for. You know, Congress didn't provide a private right of action for violation of the FDCA. No, Your Honor. Basically, you're arguing for a private cause of action. I'm not arguing, Your Honor, in one iota of any fashion for a private right of action under the FDA. I am arguing, number one, for federal RICO, number two, for New Jersey RICO, which is fundamentally parallel, unjust enrichment, and tortious interference with contract. Just because there is not a private right of action for off-label marketing doesn't mean we, the only people who would have standing to bring our claims because we are the only people who paid this money, can't make out a cause of action to seek to recover it. But Judge Chesler said off-label marketing isn't the same as showing that the products were ineffective or unsafe. And accepting that arguendo is true, Your Honor. I think that doesn't get us where we need to get because we allege more than that. We allege specific falsity. We allege in our complaint, beginning, I believe, on paragraph four, and then in the Temodar section, that the defendants internally believed, according to their own documents, and according to the Office of Inspector General, that Temodar claims that it crossed the blood-brain barrier, which was a huge competitive advantage, if it were true, was false. Did the amended complaint allege that Local 331 paid for Temodar? No, it does not, Your Honor. But there, it does not. Now we're right to the horns of what I believe the trial court calls the dilemma. And that is, how close a connection- Your red light is on, so you have to finish with that sentence. Okay. And the question simply is, how close a connection do you have to draw? And the answer is, under Worth v. Seldin, under Phillips, under Lujan, under Defenders of the Wildlife, general factual averments of factual standing and injury suffice at the pleading stage. We alleged more than enough in this case, in this context, to get us to discovery. And as Phillips said, we need only show enough to suggest that discovery would produce evidence of the claims. Thank you. And in this case, we did it. Thank you. Thank you. Thank you, Your Honor. You represent Mrs. Montgomery? I do. May it please the Court, Don Havlin from Havlin Hughes. My case is much more straightforward. I represent an asymptomatic patient who was given drugs that she shouldn't have been given. She contracted hepatitis C while traveling outside the country in the early 1990s. What's the causation of that? It's very simple, Your Honor. There was a shearing paid nurse placed in the liver and disease specialist. We haven't been able to identify her because we've gotten no discovery. Her name is Diana. Her last initial is S. She has signed the treatment records. She called my client in. She taught her how to inject the medications. She made sure she paid for them. She made sure she stayed on the medications. It's as direct as could happen. My fear is what happened in this case with the MDL and the consolidation of the TPP claims and the consumers is that the consumers were lost. If you read Judge Chester's decision, he reaches so deeply to try to figure out what Dr. Willis was thinking at the time he made this change in plan. In 1999, he decided when he talked to Mrs. Montgomery when she was getting married and wanted to have children that she should not take these medications because it was contraindicated. The medications would actually cause her to have birth defects. Two years later, she was called back in on September 19, 2001. That same day, Diana S. was in the office. That same day, Diana S. sent her out for tests, unnecessary tests. My client had to pay $200 to $600. We don't have the final. The issue, though, is not whether the price was raised as a result of a violation in this case, right? That's correct, Your Honor, but what's key here is Judge Chester found injury in fact by Mrs. Montgomery, unlike the TPPs. He, in fact, found injury in fact. He has tossed our case on traceability. The district court found that she hadn't shown causation. Causation, correct. So we're in the middle prong here, trying to show the lines to the unlawful marketing and sales. And I submit to you in the record, Your Honor, you've got a line by Judge Chester where he says that when Dr. Willis changed his plan for Mrs. Montgomery, this is the opinion page 13, and that he took an asymptomatic patient and gave her these drugs, our allegation that he was subjected to the marketing and sales scheme, this allegation would, if supported, form the critical link between the overt harm and the complaint of conduct. Then he goes on to say that equally reasonable inferences, such as Dr. Willis may have come to such an understanding from his own correct or incorrect reading of available medical literature, the compendia or discussions with other medical professionals, none of that's in the record. That was in Shearing's brief at Appendix 691, where they opined that it could have been the result of all these other things. Judge Greenberg, I'm going to co-opt your question. What happens when you remand this case? We'll ask those questions. What was the doctor thinking at the time? And why don't we ask this Diana S., this mysterious person whom Shearing has yet to say is not their employee? They reached so deeply into the record here to pull medical records out to try to say that Mrs. Montgomery should have known a lot more. I respectfully submit to you when you go to your doctor and you're sitting there waiting for the doctor to come in, you don't know what's happening in the next room. When the drug representative is talking to the doctor, that happened here. We've alleged quite clearly that there was a Shearing-paid PCC nurse. Now, I want to spend a little bit of time on the record because it's wholly ignored by Judge Chesser in terms of traceability. If you go to our under seal volume and you begin with just what the relator said. Now, these are three former employees of the company who had personal knowledge of what they were saying. In their allegations, which were part of the criminal prosecution and the resolution by the company at Appendix 1331, they say patient care consultants were in-house defendant nurses that the sales representatives directed to physician offices. There were approximately 30 to 35 of them. Carrying over, it says PCCs attended sales meetings, gave input, and worked with the sales force to maximize sales at targeted accounts. Their job was not to act like nurses in the best interest of patients. It was to sell drugs for off-label purposes. The record is crystal clear from 1999 to 2001. Mrs. Montgomery was asymptomatic. She had no evidence of compensated liver disease for which the drugs were approved. She was given a noxious cocktail of not one, but two drugs. Judge Chesser, I think, misapprehends that Ribitol is the one that had the Tetragena effects that could have caused birth defects. In both situations, the doctor was very concerned about Ribitol and said that she was contraindicated both times. But the key here is she was given a cocktail for something she shouldn't have gotten. And that's what's offensive in this case. But this isn't a malpractice suit. Correct. It's against the company for placing a sales representative under the auspices of the doctor. And if I may complete, you go to the next step. What did the company say in the documents that we put in the record? They have a training protocol at Appendix 1384. And it says, what am I going to talk to my doctors about in promoting these therapies? On page 1385, what is a patient care consultant, the doctor asks. The representative says back, they're part of the sales team. And they will pull the patient's records. Pull the patient's records to identify patients for the therapies. That, I submit, is a HIPAA violation. The patient's never called about that. The drug reps are given the access to the records to identify patients. Now, lastly, what did we put in the record that we know about our particular client and the traceability? At Appendix, beginning with the medical records on 1361, in 1999, we have the record saying that she was asymptomatic. If you begin with the progress notes of September of 2001, at page 1369, when Dr. Willis changes his mind and recommends the combination therapy, he says, this combination has not been completely approved as yet. It is likely to be approved soon. In other words, it's off-label. He says it right there in black and white. He never tells our client it's off-label. He never tells our client that that same doctor... The traceability has to go back to Shearing Plow. Absolutely, Your Honor. Now, where does that line come from? We've alleged that came from Shearing's marketing and sales promotion. That record I just read from September 19, 2001. If you turn two pages in the record, you will see... I'm sorry, it's at 1374. You will see the signature of Diana S., the patient care consultant. She wrote to my client on the exact same day. She ordered a blood test. She says, your physician has ordered a blood test. Please go get it. You'll have to pay for it yourself. She writes on there that she called the patient and spoke to her directly. Now, what's really troubling about this case is, if you look at that record and the next record from a few months later, where she sends the actual prescriptions to my client, she is using the liver and disease specialist's letterhead. She is... It's false pretenses to have a Shearing representative acting as a nurse for the doctor. But this suit is not about false pretenses. It's about consumer fraud, Your Honor. And if I may, our claims are very different. We have Washington Consumer Fraud Act claims. Unfair and deceptive acts and practices. Not RICO. We also have aiding and abetting. Aiding and abetting the doctor's breach of his obligations to the patient. The district court concluded that your argument that, quote, Dr. Willis's revised treatment plan must be attributable to some nefarious influence or interference by Shearing, was based, his words, purely on speculation and suspicion. What's wrong with that? Well, I think, Your Honor, he's labeling. He hasn't looked at the records and taken as true what we said. Oh, I know. You can't say that Judge Schessler didn't look at the records. Your Honor, I see no discussion... I see no discussion of the records that I just put before you, that this nurse, paid by Shearing, using the letterhead of the practice, writing to my client. This nurse actually brought her in, prescribed the medications, taught her how to inject, made sure she stayed on the therapy. That's not speculation. She doesn't allege that the drug caused her any harm. She alleges that she shouldn't have gotten it. As I said, we're not arguing injury here. Well, maybe not, but she doesn't allege that it caused her harm. She does allege, Your Honor, that it caused her to be sick and that she was in bed and lost work for two weeks. It's not a personal injury case, in fairness. It's an economic case. But it's an economic case against a company that's promoting unnecessary medications. That's the problem. And I finish by just citing the cases, Your Honor, that talk about how you would allege these facts and how you deal with circumstantial proofs. We haven't gotten the benefit of any inference of these allegations, that this Shearing representative was doing all these things. Okay, thank you. Thank you, Your Honor. Your red light is on. Let's hear from Shearing, see what they answer. Good afternoon. May it please the Court, my name is Gavin Rooney. I represent Shearing Plow and the other appellees before this Court. Let me start with the complaint filed by the third-party payer, Local 331 Fund, with regard to the issues of standing, specifically injury and traceability. Let me start by saying that the matter before this Court is vastly more simple than what Chesler decided at the District Court level. And the reason for that is that only one of the four third-party payer plaintiffs brought this appeal. The only one that is before this Court is Local 331 Fund. And I believe, as the Court correctly has pointed out, their allegations are very limited. They allege that they paid for two prescriptions of a drug called Ribitol, and that's really about it. There's no allegations in the complaint that the Ribitol that was prescribed for their members proved unsafe. There are no allegations in the complaint that the prescriptions for Ribitol proved ineffective for their members. There's no allegations in the complaint that the doctors, the specific doctors who prescribed those drugs were somehow misled by Shearing Plow through some false or misleading statements. There's no allegations that those doctors, whomever they might be, were somehow induced to prescribe this drug through a bribe or some sort of improper remuneration. The only allegation is a conclusory one that the prescription was, quote, off-label, without any sort of backup or any sort of facts to substantiate that conclusion, which one would think would at least include the indication for which the drug was actually prescribed. And as we know from recent Supreme Court jurisprudence, conclusory allegations like this are not enough. If we take a step back from the allegations of Local 331 and read through the complaint, the Court will read in vain for any even general allegations of any materiality with regard to Ribitol. When Mr. Greigel was up here before, he was speaking extensively about Temidor. He said something about alleged misrepresentation Shearing made about whether that drug crosses the blood-brain barrier. Well, Mr. Greigel's client is not alleged to have paid for that drug. It's neither here nor there. There were allegations in the complaint about another drug called Intron A. That, again, these are not issues that are pertinent to this particular third-party payer plaintiff. You're arguing a 12B6 aspect of the case, then, that laying aside the question of constitutional standing, the plaintiffs have not pled a claim which is a lower standard upon which relief may be granted. In other words, you can have constitutional standing, but not adequately alleged claim. Understood fully, Your Honor. We moved in the alternative at the district court level for dismissal under 12B6, and we have made that argument to this brief as well. And I think Judge Chesler did reach that 12B6 standard with regard to the common law claims that are pled in the complaint. But let me stay on standard. Is that the which claims? The common law. The common law claims. There were claims for conspiracy and tortious interference, et cetera. Let me stay, though, on standard. But you're going to say that a claim doesn't satisfy 12B6 because constitutional standing is pretty broad. Broad it may be, but it requires something. It requires something. And what it boils down to here is this plaintiff paid for two prescriptions of Revitol, period. That's not enough. If that's enough, then it suggests that any insurance company, any health maintenance organization, or any consumer that paid for the purchase price of Revitol has a right to sue. And that cannot be the case. Suppose we thought that the complaint didn't state a 12B6. It didn't state it to secure, to survive that motion. Would we be compelled because constitutional standing is jurisdictional to meet the constitutional standard? In other words, is there any way we can not deal with constitutional standing? Well, I believe standing is a first step in the analysis. So the court would need to deal with that before turning to the 12B6 standard, which is what Judge Chesler did below. But I do believe under the standing analysis, they have not pled the facts. Standing is one of those things you can assume without deciding. Yes, you can assume without deciding. I will point out that the Fifth Circuit in the Rivera case, involving another drug that did have a health issue which resulted in its withdrawal from the marketplace, when looking at an appeal on a certification of a class, said there was no standing because there was no allegations that the drugs purchased by the plaintiffs proved unsafe or ineffective. So I think this is a standing issue as recognized by the Fifth Circuit. But I agree with Your Honor that the Eleventh Circuit in the Iron Workers case, in an opinion that relied heavily on the opinion by Judge Chesler below, dismissed on a 12B6 standard, essentially applying the same sort of analysis. So I think that is correct. I wanted to emphasize a couple more things with regard to the third-party payer complaint. First of all, the court can read the complaint at length. And the allegations about Revitol, even those allegations that are divorced from this plaintiff's experience, are thin. We're told little more than Revitol was approved by the FDA to treat patients with chronic hepatitis C. While Mr. Greigel in his argument makes arguments about Temdar marketing, Intron A marketing, the complaint is really silent about any alleged untoward activities with regard to the marketing of Revitol. Mr. Greigel mentions, as well as Mr. Haviland, the criminal matter for which a shearing subsidiary pled guilty before Judge Saris in the District of Massachusetts. Again, that matter involved different drugs. It involved Temdar, it involved Intron A. It did not involve Revitol, which is what the third-party player plaintiff here paid for. It did not involve what Ms. Montgomery paid for either, which was a combination of Revitol and another drug called Pegintron, which was given to her as a combination therapy. So that's what we're left with. We're left with the bare allegation that this third-party payer plaintiff paid for two scripts of Revitol, period. And as Judge Chesler correctly held, that is simply not enough to establish the necessary elements of Article III standing to even open the courthouse doors. If the court were to proceed to the 12B6 analysis, it's certainly not enough for that. Why isn't it economic injury that they paid for drugs that shouldn't have been sold off-label? Well, it's not injury unless you don't get what you're paying for, as I think Judge Greenberg had recognized in the Mayo opinion involving a case of insurance. Simply being sold a drug off-label doesn't really tell you that much. As we've cited in our brief, off-label prescriptions are permitted by doctors. Supreme Court of the United States has recognized that in certain instances, that's the standard of care with regard to certain kinds of diseases. So the mere allegation that it was prescribed for an off-label use, conclusory as it is in this complaint with this plaintiff, would not be enough to show injury. That's why the precedents have told us you need to ask, is it unsafe? Is it ineffective? That's what supplies the injury. Why aren't the allegations of Ms. Montgomery adequate? You referred to the iron workers case where the court said the purchased drugs must have been either unsafe or ineffective for the prescribed use, i.e. the prescription needs to have been medically unnecessary or inappropriate according to sound medical practice. And when I listen to counsel for Ms. Montgomery, that's what he seems to be saying he alleged in the amended complaint. He does allege that. And I recognize that Judge Chesler found that the complaint sufficed the state injury. In fact, and I think the analysis there is a traceability one, and I want to spend most of my time on that. But the answer to your honest question, I don't think there is injury here really for two reasons. One, the drug was effective. And we put in the additional excerpts from the medical records that show that after treatment, hepatitis C was undetectable in this plaintiff's bloodstream, which means it's been eradicated. So it was effective. So I think that deprives us of injury. Is that an issue of fact that somebody has to decide? No, I think it draws itself from the medical records. Many of those medical records are attached to the complaint. And I think under a rule of completeness analysis, the court can consider the entirety of the medical record which was produced by the plaintiff in the past. But let me address this traceability issue since that I think is the easier analysis and certainly where Judge Chesler found his opinion. Traceability or causation on a 12B6 analysis requires something more than speculation and suspicion, which is what it sums up as. The allegation by this plaintiff is that there was, it's stated as a quote belief, that's in paragraph 10 of the Montgomery complaint, a belief that Shearing had a nurse on its employ, on its payroll that was in the physician's office that was administering the treatment. But let's ask, well, what is it that that nurse, that licensed practical nurse was alleged to have done? The only thing that licensed practical nurse was alleged to have done is that which licensed practical nurses normally do, help train a patient to give injections herself of the drug that's being prescribed. Even during Mr. Haviland's argument a few minutes ago, that's what it sums up to. What is missing is any allegation that this nurse somehow supplied false statements, misleading statements, misled this doctor into prescribing the drug, or somehow supplied some inappropriate payment that subverted the physician's judgment. There are no allegations of fact at all in the complaint addressing that, and that is why that theory fails. Additionally, the belief is mere speculation, nothing more, that this was a shearing paid nurse. It's based upon nothing more than the fact that on the letterhead of the medical practice, this person's name is not listed. But if you look at the letterhead, what it lists are MDs, doctors and physicians, and the nurses, the professional nurses that are entitled to prescribe medicine. Licensed practical nurses such as this particular nurse are not listed on the letterhead, and that's for obvious reasons, as we've explained in our papers. All you need is a two-year, all you need is a high school diploma and a couple years of training to become a licensed practical nurse. You're not entitled to treat patients. You're not entitled to prescribe medicine. So that's all it's based upon. The rest of the speculation arises from the theory that there was a change in Ms. Montgomery's treatment plan, and that must have been due to some funny business by shearing plow. Again, that's based upon speculation and suspicion and nothing more. The medical records, and these are actually quoted in the complaint, and these are attached to the complaint, tell a much more reasonable inference and a much more reasonable explanation, much more likely explanation than that. And the explanation, which is alluded to by Mr. Haviland, is that ribatol, one of the components, is contraindicated for women who may become pregnant. Why? Because it may cause birth defects. When she initially consulted with her doctor in 1999, she said, I'm about to get married. We're thinking about having kids. So the doctor says, you know, let's not go forward with the treatment now. She comes back two years later, and in the September 19, 2001 document that's attached, I think, is Exhibit E to the complaint, she tells the doctor, well, I've not been able to conceive a child, so now I'm reconsidering my treatment options. That is the likely explanation as to why the therapy proceeded in 2001, whereas it did not in 1999, and it comes right out of the complaint and right out of the exhibits to the complaint. You know, under the current system of what we require complaints to show, you have to plead more than you used to have to plead when I practiced law. Is that the underlying basis for your, I guess it would be a 12-B-6, but, or? Yes. There's no question that the Supreme Court has reset the standards. This Court recognized that in Fowler, that Iqbal and Chwamly put the nails in the coffin of the old Conley versus Gibson test, which, by the way, is explicitly relied upon by Ms. Montgomery in her brief, on page 23 of her brief, as I recall. There's no question that that is not the standard anymore, and those sorts of facts are not pled here. We need to strip away the conclusory allegations, look at the allegations of fact, and then ask whether that creates a plausible claim for relief, and also consider whether there's more likely explanations. And as the Supreme Court taught us in Iqbal, judges also need to use their common sense and good judgment entered into this, and that's exactly what Judge Chesler did here. Finally, I'll just close by saying that, obviously, while these are presently just individual suits, they're putative or would-be class actions. The plaintiffs have sought to bring a very large controversy in the federal court in New Jersey. Chwamly teaches that we should take a look at these cases with a hard look at the outset. It's not an answer to say, well, discovery may turn up issues that would substantiate a claim that needs to be pled in the complaint before we put the parties in the court through an incredibly expensive. You used to be able to do that. I'm sorry? You used to be able to do that. Yes, no longer, no longer, Your Honor. That's certainly true. And I would close by noting that these plaintiffs have had multiple opportunities to get it right in their complaint. The complaints before this court are actually the fourth iterations we went through. There were two complaints before Judge Chesler, in his 2009 opinion, dismissed them without prejudice. He dismissed the third complaint at that point. And he gave a very long, well-written opinion that explained exactly what they needed to plead. And that's exactly what's missing in the current complaint. Thank you. Thank you. Do you have any questions? I don't have any questions. No, I do not. This is the former one minute that's now two minutes. Yes, Your Honor, and let me try to use that very wisely. I submit that it's not true that the law has changed. Oh. The Ninth Circuit said in the recent case of Maya v. Sentex, which is 653 F3rd at 1067, Twombly and Iqbal are ill-suited to the application in the constitutional standing context. We simply note that Twombly and Iqbal deal with fundamentally different issues than the jurisdictional question that Judge Greenberg, you just addressed. This court has repeatedly said, in the issue of the causation, in the Ballantyne decision cited by Judge Chesler, and then in the recent in-rape insurance brokerage case, that we're not required to prove injuries at this point. Judge Chesler, Your Honor, when he says that we haven't had that connection, he said we needed to demonstrate our injuries. I submit to you we don't. So the injury is not the issue with respect to Ms. Montgomery, but the traceability is. And where is there evidence that fraud perpetrated on Dr. Willis caused the treatment regimen she was... That's where I think we lost touch with Judge Chesler. And we did not have a hearing on these issues. We weren't able to have this dialogue and we're having it here. We have a shearing nurse right there. Shearing interjected a number of records saying that look at all these different records. Look at the fact that the shearing paid nurse is having direct interactions, is actually calling the patient in. The doctor is there. In the actual medication record, you see the doctor's stamped signature, but it's Diane S.'s actual signature. She's regulating. And if you go back and look at what the relator said, that's exactly what shearing intended. To have these nurses paid by the company go in to facilitate treatment, but in fact to promote medications for off-label uses. And I submit to you, if you step back and look at the situation, you've got a company that was criminally prosecuted by its own employees... But not for this. For exactly this, Your Honor. For off-label promotion of rivitol and pegintron. And that's what my client got through the hands of a shearing paid nurse. And as we sit here today, that's the status of the record. Judge Greenberg, the last point, if I may, is if you just remand back, we get to ask those questions of Dr. Willis, Diana S., and we get to find out who these 35 nurses were. Where were they stationed? And who were they bringing in to promote these drugs? It's not the doctors. It's shearing. Thank you. Thank you. Thank you. We'll take this matter under advisement.